The DREXEL BURNHAM LAMBERT GROUP, INC., Plaintiff,

v.

A.W. GALADARI and A.W. Galadari Commodities, Defendants.

REFCO, INC., Plaintiff,

v.

Abdul Wahab Bin Ebrahim GALADARI and A.W. Galadari Commodities, Defendants,

and

the Committee of Receivers for Abdul Wahab Bin Ebrahim Galadari and A.W. Galadari Commodities, Additional Defendant.

Nos. 84 Civ. 2602 (CBM), 90 Civ. 1241 (CBM).

United States District Court, S.D. New York.

March 19, 1991.

Thomas W. Hill, Jr., Edward L. Powers, Richards & O'Neil, New York City, for Drexel Lambert.

Carlton R. Asher, Jr., Robert L. Jauvtis, Bickel & Brewer, New York City, for A.W. Galadari Commodities & Committee of Receivers.

Jack Weinberg, Marianne Bretton–Granatoor, Graubard Mollen Horowitz, Pomer-anz & Shapiro, New York City, for Refco, Inc.

## OPINION RE VACATING STAY

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

### SUMMARY STATEMENT

This case is now before the court on a motion by plaintiff, The Drexel Lambert Group, Inc., to vacate the stay of this action. The stay order was entered by this court in January 1987 staying this action pending the outcome of receivership proceedings initiated by the government of Dubai, United Arab Emirates, relating to the business affairs of defendants, A.W. Galadari and A.W. Galadari Commodities. Drexel claims that it has been denied due process in the receivership proceedings in Dubai in that the Committee of Receivers appointed by the Dubai government has not, after seven years, decided or paid its claim and has not functioned fairly and impartially, as expected by this court in 1987 in staying the instant action.

Drexel's claim in this action arises out of a secured promissory note given to Drexel by A.W. Galadari and A.W. Galadari Commodities in New York in September 1982. The principal amount of the note is $19,465,000. The last payment of principal on the Note was made in August 1983, leaving a principal balance of $12,465,000. By the terms of the Note, the annual interest rate on the unpaid principal is 13.75 percent.

The Note is secured by six million shares of the Union Bank of the Middle East ("UBME"). The share certificates are printed in Arabic. Sometime after the Note was signed and the shares turned over to Drexel, Drexel translated the share certificates, which roughly translated, state that the owner of the shares is A.W. Galadari Holdings Limited, another company owned by A.W. Galadari.

On April 12, 1984, Drexel commenced this action. The defendants did not appear. However, the Committee of Receivers, ap-

pointed pursuant to Dubai Decree No. 3 of 1984 ("the Decree") did appear and answered Drexel's Complaint. Under the Decree, the Committee is charged with liquidating the assets of Mr. Galadari and his companies and distributing the funds to the Galadari creditors.

The Committee was and is represented in this action by Carlton R. Asher, Jr., then a member of the New York law firm Gaston & Snow. Mr. Asher is now with the firm Bickel and Brewer. The Committee's answer also bears the name of Richard E. Nathan, then a member of Gaston & Snow. Mr. Nathan has since left the firm. The Committee asserted twenty-five affirmative defenses to Drexel's claim, including defenses of failure to state a claim, failure to mitigate, waiver and ratification, account stated and accord and satisfaction.

Drexel timely filed its proof of claim with the Committee in Dubai on or about July 29, 1984.

In June 1984, the Committee moved to stay or dismiss the action in this court on the ground, *inter alia,* of international comity. This court granted the motion in 1985 and dismissed this action. On appeal, the Second Circuit remanded for further development of the record regarding the international comity defense raised by the Committee. 777 F.2d 877 (2d Cir.1985).

The Second Circuit noted that the Decree represented Dubai's first attempt to frame an insolvency law and that the proceedings in Dubai were "uncharted territory" for purposes of determining whether such proceedings comport with notions of fairness and due process, when compared to similar proceedings in the United States. *Id.* at 881.

Meanwhile, between April 1984 and late 1986, a period of about two and a half years, Drexel's claim was "the subject of extensive proceedings before the Committee of Receivers. Drexel and the Receivers [had] exchanged hundreds of pages of documents relating to the factual bases for the claim." *Drexel Burnham Lambert v. Ga-*

*ladari,* 84. Civ. 2602 (S.D.N.Y. Jan. 29, 1987) at 31–32, ¶ 127, 1987 WL 6164 (hereinafter "Comity Order").

In mid–1986, Drexel discovered that the audited accounts for A.W. Galadari Holdings ("Holdings") for the year ended March 31, 1982, listed Commodities as a wholly-owned division of Holdings. Tr. 9–10 [1]; Comity Order at 32–33, ¶ 129. The group financial statements of Holdings, dated November 9, 1982, were signed by the Holdings Chairman, Mr. Galadari, and director, Abdus Sami, and audited by Peat Marwick Taseer Hadi in Dubai ("Peat Marwick Dubai"). Drexel 1986 Exh. KKK.

Drexel immediately advised the Committee that Drexel believed its claim should be paid from the Holdings' funds. Drex.Exh. A–6; Tr. 10. This is important because, under the Decree, each Galadari company is treated separately for the purpose of creditors. Drexel Exh. S ¶ 7(j). The Committee has acknowledged that while there are no funds to pay Drexel's claim from the proceeds of either Mr. Galadari's personal assets or those of Commodities, Holdings has substantial assets. 1986 Tr. 1187. The Committee has also assured this court that it has set aside sufficient Holdings funds to pay Drexel to the same extent it has paid other creditors of Holdings (90 percent of their claim). 1986 Tr. 1190; Tr. 10–11.

On remand, in October 1986, this court conducted an evidentiary hearing over a three-week period to determine whether the Dubai proceedings should be afforded comity deference. Both Mr. Asher and Mr. Nathan appeared and argued on behalf of the Committee during the hearing.

During the evidentiary hearing, the Committee represented to this court that it would act in accordance with due process in administering Drexel's claim. 1986 Tr. 1173–1176.

On the basis of this and similar representations and the evidence introduced by the Committee during the hearing in 1986, this court was persuaded that the Dubai pro-

---

1. "Tr." refers to the transcript from January, 1991. All other citations to transcripts designate their date.

ceedings would be conducted in a manner consistent with this Country's notions of fairness and due process. Order at 40, ¶ 10.

Since that time, at Drexel's instigation, this court has held periodic conferences with counsel for the Committee and Drexel as Drexel vented its frustration with the long delay in deciding the validity of its claim and making payment. During a May 1990 Conference, the court finally instructed Drexel to move to lift the stay of the action since the court would not lift the stay without an evidentiary hearing. Drexel made its motion and the hearing took place on January 16–18, 1991 and March, 18–19, 1991. After the January hearing, the parties were directed to submit Proposed Findings of Fact. On March 18 and 19, additional evidence was received as to the separate claim of Refco and oral arguments were heard on Drexel's claim. The parties were given ten days to file supplemental findings with respect to evidence offered on that date regarding Refco's claim.

For the reasons set forth below, Drexel's motion to lift the stay is granted, effective April 16, 1991, unless the Committee has decided Drexel's claim before that date.

First, this court finds and concludes that the Committee has failed to proceed with deliberate speed to decide Drexel's claim notwithstanding the fact that it has liquidated most of Galadari's assets and paid most of the claims before it. The Committee has had Drexel's claim before it for almost seven years without having reached a determination as to whether or not the claim will be paid. The Committee has advised that A.W. Galadari personally and A.W. Galadari Commodities do not have funds with which to pay its creditors but that another Galadari Company, Holdings, does have such funds. Thus the principal issue in this case is whether Commodities is a division of Holdings. For the last four years, the Committee has not determined this relatively simple issue. This delay has persisted in spite of the fact that the Committee has before it twenty-one different opinions regarding the issue (Drex.Exh. DD), including an opinion by the Committee's own special advisor, a Mr. Filler, who concluded in 1989 that Commodities was a division of Holdings, and reports from accountants to the same effect.

Notwithstanding these several opinions and substantial evidence in support of Drexel's contention that Commodities was a division of Holdings, the Committee has not decided the Commodities/Holdings issue. In 1986, this court was advised that a decision on this issue was only a few months away. This court has been given no satisfactory explanation as to why this issue has not been decided in the past four years by the Committee. When on March 18, 1991 this court expressed the view that the Committee had been dragging its feet, Mr. Asher presented the court on March 19, 1991 with a memorandum drafted by him for the Committee the night before advising the court that the Committee would decide the legal issues and Drexel's claim by April 15, 1991. The Committee had not previously given a date by which it would decide the Commodities/Holdings issue, or any other issue, despite repeated complaints, over the years, from Drexel to this court. A copy of the March 19, 1991 memorandum to this court is attached as court's Exhibit A. As one can observe, the two signatures on the memorandum are not legible and no name is typed under either signature.

Second, in spite of the representations of the Committee, via Mr. Asher, in 1986 that the Commodities/Holdings issue was the only major issue that remained to be resolved before Drexel's claim would be paid, and the March 19, 1991 memorandum, Mr. Asher has now stated, on the final hearing of this motion on March 19, 1991, that there are, in fact, numerous other issues that remain and must be resolved before Drexel can be paid. As the record will reflect, Mr. Asher, when asked by the court to enumerate these issues off the top of his head listed several such issues, many of which, over the years, had been alluded to by Mr. Asher and which have been before the Committee for years. Tr. March, 1991 Tr. 285–287. The Committee has not provided this court with an itemized list of

what issue other than the Commodities/Holdings issue remains undecided. No explanation has been offered by the Committee as to why these other issues have not been decided. The court finds that the other issues, enumerated by Mr. Asher as still to be resolved by the Committee, can be quickly decided. As the record reflects, the Committee has previously investigated these issues, has received reports and advice on the issues, and Drexel has complied with the Committees' several requests regarding these issues. This court finds and concludes, in view of the long prior delay in this case, that the resolution of the issues relating to Drexel's claim will take years, unless the stay is lifted. This court has been previously advised by Mr. Asher that many other claims of creditors have been paid, except a few American and British claims. The Court finds that the delay in deciding the Commodities/Holding issue and the other alleged issues has been deliberate and the result of the harassing tactics of Mr. Asher who is not only counsel to the Committee in this court in opposing the claim of Drexel for payment but is *de facto* the Committee with respect to Drexel's claim.

Third, it has now become clear to this court as a result of hearing Drexel's motion and discussions at prior conferences that the proceedings in Dubai regarding Drexel's claim have become little other than a legal wrestling match between Drexel and its counsel and Mr. Asher. Because of this unprofessional circumstance and Mr. Asher's obvious influence over the decisions of the Committee, the court finds and concludes that Mr. Asher has a serious conflict of interest in acting as both advocate for the Committee in this court in opposing Drexel's demands for prompt payment for which he is paid and as legal advisor to the Committee, itself, which includes drafting its opinions and replies to Drexel.

Fourth, this court finds and concludes that the inordinate delay in deciding any issue relating to Drexel's claim since its filing in 1984 and the conduct and role of Mr. Asher have combined to deny Drexel basic due process with respect to its claim before the Committee—i.e. a fair, impartial, and reasonably prompt hearing before the Committee.

### I. The Committee Has Delayed Resolution Of Any Aspect Of The Claim

Drexel filed its claim with the Committee in July 1984. Drexel Exh. I, ¶ 15.

As this court found in January 1987, by the end of 1986, extensive proceedings involving Drexel's claim had taken place in Dubai. Comity Order at 31–32, ¶ 127. The Committee assured this court in October 1986 that Drexel would be paid if it was determined that Commodities was a division of Holdings. 1986 Tr. 769–770, 1186; Tr. 17. They also claimed that the issue—whether defendant Commodities was a division of Holdings—and Drexel's claim in general, would be decided within two months. 1986 Tr. 1172.

The Committee held hearings on Drexel's claim in February and April 1987. Committee Exhs. 1–4, 11. Drexel submitted its proposed findings in August 1987. Committee Exh. 13. The Committee then asked its confidential legal advisor, Mr. Asher, to submit supplemental proposed findings. Drex. Exh. A–70 at 2. These supplemental findings, which did not refer to Drexel's findings, were submitted in February 1988. Comm. Exh. 26. The Committee then instructed Drexel to submit a response to Mr. Asher's proposed findings, and Drexel did so in May 1988. Comm. Exh. 38.

Drexel completed its submissions to the Committee nearly three years ago. By May 1988, Drexel had submitted (1) proposed findings (Comm. Exh. 13), (2) a reply to Mr. Asher's supplemental decision (Comm. Exh. 38), (3) the legal opinions of Freshfields (an English law firm) (Comm. Exh. 18; Drexel Exh. A–33, 45, 46), (4) the legal opinions of Samir Saleh (a Middle East legal expert) (Committee Exh. 21, 135), and (5) accountancy opinions of Price Waterhouse on the Commodities/Holdings issue. Committee Exh. 7, 10, 12, 22.

To date, neither the Commodities/Holdings issue nor any of the other issues raised by the Committee since January

1987 have been resolved even though the Committee now has a total of twenty-one opinions before it regarding the Commodities/Holdings issue. Drex. Exh. DD; Tr. 47–48. The reasons for this delay are principally due to the introduction of a succession of new issues by the Committee, at the instigation of Mr. Asher, and the failure by the Committee to respond or rule with respect to Drexel's submissions. Tr. March 19, 1991, at 285–292.

Although the Committee points to some isolated instances of delay caused by Drexel, this court finds that these instances were either inconsequential or the result of the Committee's actions which necessitated Drexel's reaction for the protection of its rights.

## II. The Committee Has Not Acted As An The Impartial Tribunal of Drexel's Claim

Drexel contends that the Committee and its advisors have acted more like adversaries in the Dubai proceedings than members of an impartial tribunal. The Committee responds that it simply has been fulfilling its responsibilities to all creditors of the Galadari assets. This court is persuaded that Drexel's contentions are correct, and that the Committee has spent the past four years trying to find roadblocks to Drexel's claim.

Drexel Exhibit Z is a three-page memorandum of contemporaneous notes taken by Mr. Paul Holden of Spicer & Oppenheim. (As discussed more fully below, the Committee retained Spicer & Oppenheim to report on the Commodities/Holdings issue.) Mr. Holden, who authored the Spicer and Oppenheim June 1990 report (the "Spicer report") (Comm. Exh. 67) took these notes during his initial meeting with representatives of the Committee, Richard Butler, on January 15, 1989. The Committee has stated that Spicer was retained as "judicial experts" to assist in the Committee's fact-finding mission. However, Mr. Holden's notes reveal something far different.

The context of Mr. Holden's meeting is essential to an understanding of the relevance of his notes. By 1988, Drexel had submitted to the Committee substantial evidence supporting its claim that Commodities was a division of Holdings. This evidence included (1) the 1982 Holdings audited accounts, (2) Holdings Board of Directors' minutes authorizing the inclusion of Commodities in the Holdings accounts, (3) the testimony of Holdings' board members to the effect that Mr. Galadari had "assigned" his interest in Commodities to Holdings at the relevant time period, and (4) the legal opinions of Dubai and English lawyers that such an assignment would be legally effective under their respective jurisdictions' laws. Comm. Exh. 18, 21, 23, 134, 136; Drex. Exh. A–33, 45. In addition, the Committee's Special Advisor, Ronald Filler, advised the Committee in January 1989 that in his view the evidence supported the conclusion that Commodities was a division of Holdings. Drex. Exh. L at ¶ 157–187.

At the same time, the Committee had no legal or accountancy opinions before it that reviewed the record evidence and came to a different conclusion. So, in June 1989, the Committee retained yet another expert, Spicer and Oppenheim, to conduct its own investigation and issue a report. Drex. Exh. A–218.

Turning back to Mr. Holden's first meeting with Richard Butler, Mr. Holden recorded that "John Emmett [sic] & Rowan in the U.S. making preliminary discrete inquiries on how commodities trading would be done in 82/83. Short period when commodities prices rigged. G[aladari] controlled 20% of market [,] feeling that D[rexel] might have screwed him into ground (Rooked in 2/3 weeks led to difficulties)." Drexel Exh. Z.

The reference to Mr. Emmott's "discrete" inquiry in the United states reveals an extra-record investigation never disclosed to Drexel. More importantly, this court cannot understand why Richard Butler would be telling an "independent" expert advisor hired solely to opine on the Commodities/Holdings issue about a "feeling that Drexel might have screwed Galadari." The court can only conclude that such a statement was made so Drexel would appear as an unworthy creditor.

Furthermore, the Committee's effort to procure evidence for the purpose of resisting Drexel's claim is wholly inconsistent with the impartial role a judicial or quasi-judicial body must play.

### III. The Choice of Carlton Asher Unfairly Tainted All Committee Proceedings

Mr. Asher's former law firm, Gaston & Snow, represented A.W. Galadari in connection with the execution of the Note that is the subject matter of this action. Mr. Asher's then partner, Richard Nathan, assisted in drafting the Note, took part in the negotiations which led to the signing of the Note and represented Galadari at the execution of the Note and tender of the UBME stocks on September 14, 1982. Drexel Exh. D at 36–49.

Under the terms of the Note, Gaston & Snow was designated the defendants' agent for service of process in any legal proceeding arising out of the note.

After Drexel filed suit in this court, it was Mr. Asher who signed the Answer to Drexel's Complaint. The Answer alleged twenty-five affirmative defenses to Drexel's claim. The issues presented by Drexel's Complaint in this court are, in most respects, identical to the issues presented by Drexel's claim in Dubai. Mr. Asher's assertion of substantive defenses to Drexel's claim, and his subsequent conduct as reflected in the Committee correspondence that he drafted, evidence his zealous representation of the Committee and his lack of neutrality toward Drexel.

Nevertheless, Mr. Asher acted as the Committee's confidential legal advisor until February 1989. Drexel Exh. A–191. In this capacity, Mr. Asher drafted virtually all of the Committee's correspondence to Drexel during 1987 and 1988. Tr. 371. Mr. Asher—writing in the name of the Committee—drafted statements to Drexel such as: "the Committee will not accept any further open disrespect of its process from Drexel." Drexel Exh. A–151 at 2; Tr. 375. Mr. Asher even wrote the Committee's responses to his own letters. Drex. Exh. A–228; Tr. 382–384.

At the Committee hearings in Dubai in 1987, Mr. Asher met privately with Committee members before and after the hearings. Tr. 41–42. During the hearings, Mr. Asher raised objections, examined witnesses and submitted evidence to the Committee. Committee Exh. 1–4, 11; Tr. 41–42, 385–387.

Given the confidential nature of his relationship with the Committee, and his wide-ranging involvement in the Committee's handling of Drexel's claim, Mr. Asher took on the role of a quasi-member of the Committee. When Mr. Asher's conflicting roles became apparent to Drexel, they repeatedly made objections to the Committee. Drex. Exh. A–84, 136 at 2. In May 1988, Drexel moved before the Committee to disqualify Mr. Asher from any further role in the Dubai proceedings. Drexel Exh. A–116.

Over Drexel's objection, Mr. Asher represented himself *and* the Committee at the hearing held to consider his own disqualification. Comm. Exh. 59, 60; Tr. 51; Drex. Exh. A–144, 159 at 2, 167. The Committee consulted with Mr. Asher in determining that motion and eventually issued a decision denying the motion. Tr. 390–399, 406–407. The written decision adopted, in large part, a draft authored by Mr. Asher. Drex. Exh. A–191; Tr. 389–390.

Although the Committee denied Drexel's motion it, nevertheless, replaced Mr. Asher as its confidential legal advisor in the Dubai proceedings. Drex. Exh. A–196. Using language drafted by Mr. Asher, the Committee advised Drexel that Mr. Asher would no longer have *ex parte* communications with the Committee. Drexel exh. A–191 at 7; Tr. 52, 399–400.

Although there is no evidence that Mr. Asher had *ex parte* communications with the Committee, itself, after this order was issued, Mr. Asher acknowledged that he did have *ex parte* communications with the Committee's new confidential legal advisor, Richard Butler. Tr. 413. Furthermore, Mr. Asher continued to represent the Committee at the proceedings in this court as well as at depositions held in London. Comm. Exh. 128. As recently as March 18,

1991, Mr. Asher was drafting correspondence from the Committee to this court. Mr. Asher's dual roles present a clear conflict of interest.

The Committee argues that Drexel waived its right to object to Mr. Asher's conflict. Specifically, the Committee claims that Drexel's attorney, Mr. Hill, made comments during a February 1987 hearing in Dubai which constituted a waiver. At this hearing, Mr. Hill first questioned the role which Mr. Asher was playing in the proceedings. Drexel Exh. F at 270–271. After being assured by Mr. Asher and the Committee that Mr. Asher was playing a neutral "truth-seeking" role, Mr. Hill said he' had no objection to Mr. Asher's presence at the hearing. Drexel Exh. F at 274–275. This does not constitute a waiver, especially considering the subsequent actions of Mr. Asher and the Committee over the next few years. More importantly it was only after these initial hearings that it became apparent that Mr. Asher had a clear conflict of interest. Thus, Drexel's objection in June 1987 was timely.

IV. The Committee, Through Mr. Asher, Raised A Succession Of New Issues In The Dubai Proceedings

As noted above, the Committee, via Mr. Asher, represented to this court that Drexel would be paid if it decided that Commodities was a division of Holdings. 1986 Tr. 769–770, 1186; Tr. 17. Following the stay of this action, however, the Committee—through Mr. Asher—raised a succession of new issues, which served only to delay the proceedings and apparently served no other purpose.

The defenses interposed by Mr. Asher include the theories that: (1) Drexel may have failed to meet industry standards in initially opening its trading account with Drexel; (2) the Galadari debt to Drexel might have been reduced had Drexel liquidated his account positions sooner than it did; and (3) Drexel may have acted improperly in trading ahead of Mr. Galadari, thus contributing to his commodity losses in August/September 1982. Tr. 17–19. Drex. Exh. A–168; 169 at 1. In addition to the mitigation theories, Mr. Asher questioned whether Drexel somehow acted improperly in allowing Galadari to continue to trade after the execution of the Note and in failing to liquidate Galadari's equity position. Tr. 17–18. The relevance of these issues was not made clear to Drexel.

In early 1987, the Committee requested that Drexel produce the documents evidencing the wire transfer of funds to Drexel from the Galadari Commodities Accounts. Drex. Exh. A–34, 40, 41, 42, 50, 54, 58. Drexel's production of such documents required it to spend substantial time and money. Tr. 19, 314–315. Once again the relevance of such documents was never explained to Drexel in spite of Drexel's repeated requests for such an explanation. Drex. Exh. A–50 at 2, 55 at 2; Tr. 19. After Drexel fully complied with the Committee's request, Mr. Asher dismissed the issue of the wire transfer documents, reporting only that the documents had "marginal, if any, relevance" to the Commodities/Holdings issue. Drex. Exh. A–66.

By telex dated May 26, 1987, the Committee requested that Drexel address the issue of whether Drexel's claim against Commodities "should be treated as a timely claim against Holdings." Drex. Exh. A–66; Tr. 49. Once again, this represents a new defense which the Committee raised against Drexel after the 1986 hearings in this court. The Committee has never disposed of this issue and in its recent submissions to this court, it still refers to timeliness as an issue under consideration. Aref Aff. January 3, 1991, ¶ 7.

In response to the Committee's allegations of Drexel engaging in improper trading behavior, Drexel suggested that the Committee retain an independent advisor to conduct an investigation and report back to the Committee on the propriety of Drexel's conduct in handling the Galadari Commodity accounts. By agreement, Drexel was to compensate the expert which resulted in fees in excess of $300,000. Drex. Exh. A–50, 54; Tr. 143.

In November 1987, Ronald Filler was selected as the Committee's Special Advisor by the agreement of both parties. The Special Advisor took the testimony of fif-

teen witnesses and reviewed numerous documents. The Special Advisor found no improprieties in Drexel's activities and affirmatively stated that Drexel's conduct at all times was prudent and in conformance with industry practices. Drex. Exh. L, ¶ 187; Drexel Exh. M, ¶ 17. Furthermore, in the course of his investigation, the Special Advisor heard testimony and reviewed documents regarding the Commodities/Holdings issue. Drexel Exh. L. In 1989, the Special Advisor concluded from the evidence that Commodities had been a division of Holdings. Drexel Exh. L, ¶ 157–186. In spite of the Committee's own expert's report, the Committee has not decided any of these issues.

When the Committee appeared before this court in 1986, none of the issues described above were mentioned to the court as being viable defenses requiring consideration by the Committee. The introduction of such defenses flies in the face of the Committee's representation to this court that Drexel would be paid if the Committee determined that Commodities was a division of Holdings. Furthermore, the Committee has yet to formally decide any of the above issues. Mr. Asher's introduction of such theories exemplifies his conflict of interest. As a quasi-member of the Committee, Mr. Asher was able to interpose these defenses without any restraint from the Committee. In raising these issues, the Committee has delayed the proceedings and caused Drexel to incur unnecessary expense. Furthermore the Committee, via Mr. Asher, has failed to produce any suitable reason to justify its investigation of these matters.

## CONCLUSIONS OF LAW

Four years ago this court granted comity to the proceedings in Dubai based on assurances from the Committee that it would treat Drexel fairly. This court must now decide whether the Committee has fulfiled its promise.

■ This court's duty upon hearing a motion to dismiss or stay a creditor's action, pending foreign bankruptcy proceedings involving the debtor, is to decide whether the foreign bankruptcy proceedings comports with this country's notions of fairness and due process. *Drexel Burnham Lambert Group, Inc. v. Galadari,* 777 F.2d 877 (2d Cir.1985).

■ The burden is normally on the defendant to establish that the foreign proceeding, whether judicial, legislative, or executive, comports with our notions of fairness and due process. In this case, however, Drexel has moved to lift the stay imposed in 1987, and Drexel therefore bears the burden of demonstrating to this court that the proceedings before the Committee in Dubai are unfair.

■ Drexel's claim has been pending before the Committee for seven years. The stay of this action has been in place for more than four years. The Committee offers no credible excuse or explanation for the delay in addressing those issues related to Drexel's claim.

At minimum, the Committee owes Drexel the same duty a bankruptcy trustee in this country owes a creditor. The Committee's dilatory conduct alone would support its removal from a position as "trustee" because it has failed to discharge its responsibility to close the "estate as expeditiously as is compatible with the best interests of the parties." 11 U.S.C. § 704(1). *See also Zimmerman v. Farmington Shoe Co.,* 31 F.2d 405, 406 (1st Cir.1929) (creditors normally entitled to final distribution of estate within one year); *In re Derryberry* 72 B.R. 874 (Bankr.N.D.Ohio 1987) (delay constitutes cause to remove bankruptcy trustee); *In re Island Amusement Inc.,* 74 B.R. 18 (Bankr.D.P.R.1987) (bankruptcy trustee removed after failure to dispose of claims within six years).

It is clear that the Committee's delay in deciding Drexel's claim does not substantially conform to the duty of a trustee in bankruptcy under the United States Bankruptcy Code to act expeditiously. Under these circumstances the appropriate remedy is to refuse to continue to defer to the Dubai proceedings and to vacate the stay.

This court finds and concludes that the combination of the time which it has taken for the Committee of Receivers to decide

Drexel's claim and the conflicting and harassing role that Mr. Asher has played in the proceedings has created a situation in which Drexel has been denied due process. If the Committee has not decided Drexel's claim by April 16, 1991, this court will lift the stay of this action so that it may proceed in this court.

SO ORDERED.

Exhibit A

MEMORANDUM

March 19, 1991

TO: Honorable Constance Baker Motley

United States District Judge

United States District Court

Southern District of New York

40 Centre Street at Foley Square

New York, New York 10007

FROM: Abdulla Hassan Al–Rostamani

Hassan Mohammed bin Al Sheikh

Abdulla Lootah

Nabil Aref

Members of the Committee of Receivers for Abdul Wahab Galadari

A.W. Galadari Group of Companies

Habib Bank Building

Al Nasr Square

P.O. Box 22

Dubai, United Arab Emirates

RE: Drexel Burnham Lambert
Group, Inc.

v.

Galadari

(84 Civ. 2602 [CBM])

Refco, Inc.

v.

Galadari

(90 Civ. 2140 [CBM])

In the Matter of the Claims of Drexel Burnham Lambert Group, Inc.

*In the Matter of the Claims
of Refco, Inc.*

The Committee of Receivers for Abdul Wahab E. Galadari hereby certifies as true and correct under penalty of perjury (i) that the Committee has conducted proceedings with respect to the issue as to whether A.W. Galadari Holdings (Private) Ltd. ("Holdings"), one of the Galadari Companies which the Committee is administering under Emiri Decree No. 3 of 1984, is responsible, for receivership distribution purposes, for the claimed liabilities of A.W. Galadari Commodities; (ii) that the Committee intends to reach a decision on or before April 15, 1991 on the claims which claimants The Drexel Burnham Lambert Group Inc. and Refco, Inc. have filed or asserted against Holdings; (iii) that the Committee has received this day from its confidential legal advisors, Richards Butler, a definitive discussion memorandum concerning factual and legal matters pertaining to the issue and claims referred to in (i) and (ii) above; and (iv) that the Committee has scheduled meetings with Richards Butler to be held this coming week for the purpose of deciding these issues and claims.

We declare under penalty of perjury under the laws of the United States of America and the Emirates of Dubai that the foregoing is true and correct.

Executed on March 19, 1991

/s/[Signature]

THE COMMITTEE OF RECEIVERS FOR ABDUL WAHAB GALADARI

cc: Thomas W. Hill, Jr., Esq.
Edward L. Powers, Esq.
Richards & O'Neil
Carlton R. Asher, Jr., Esq.
Robert L. Jauvtis, Esq.
Bickel & Brewer
Jack Weinberg, Esq.
Marianne Bretton–Granatoor, Esq.
Graubard Mollen Horowitz
Pomerantz & Shapiro
I.M. Fletcher, Esq.
John F. Emmott, Esq.
Richards Butler

*By Fax or By Courier*