The DREXEL BURNHAM LAMBERT
GROUP INC., Plaintiff,

v.

COMMITTEE OF RECEIVERS FOR
A.W. GALADARI, et al.; The Emirate
of Dubai, United Arab Emirates; A.W.
Galadari; A.W. Galadari Commodities,
a division of A.W. Galadari Holdings
(Private) Limited, Defendants.

REFCO, INC., Plaintiff,

v.

Abdul Wahab Bin Ebrahim GALADARI,
A.W. Galadari Commodities, A.W. Gala-
dari Holdings (Private), Ltd., the Com-
mittee of Receivers for Abdul Wahab
Bin Ebrahim Galadari, A.W. Galadari
Commodities and A.W. Galadari Hold-
ings (Private), Ltd., and the Emirate of
Dubai, United Arab Emirates, Defen-
dants.

Nos. 84 Civ. 2602(CBM) and
90 Civ. 2140(CBM).

United States District Court,
S.D. of New York.

Jan. 14, 1993.

Graubard Moolen Horowitz Pomeranz & Shapiro, New York City by Marianne Breton–Granatoor, Jack Weinberg, Therese Doherty, for plaintiff Refco, Inc.

Richards & O'Neill, New York City by Edward L. Powers, Natalie M. Gomez (Thomas W. Hill, Jr., West Palm Beach, FL, of counsel), for plaintiff Drexel Burnham Lambert Group, Inc.

White & Case, New York City by Richard W. Reinthaler, Dwight Healy, for defendant Committee of Receivers.

Gilbert, Segall and Young, New York City by H. Barry Vasios, for defendant Emirate of Dubai.

## MEMORANDUM OPINION

MOTLEY, District Judge.

### I. INTRODUCTION

Defendants The Emirate of Dubai ("Dubai") and The Committee of Receivers for A.W. Galadari, *et al* ("the Committee") separately move to dismiss the amended and supplemental complaints of the plaintiffs The Drexel Burnham Lambert Group Inc. ("Drexel") and Refco, Inc. ("Refco"). Both motions, of Dubai and of the Committee, are denied.

Plaintiffs Drexel and Refco move jointly for security against Dubai and the Committee for costs, judgment, and potential sanction. Drexel's motion, as to costs not including attorneys fees, is granted. Refco's motion, as to costs including attorneys fees, is granted. Security covering the judgment and possible sanctions is denied as to both Drexel and Refco.

### II. BACKGROUND

Plaintiffs in these consolidated actions seek damages from the government of Dubai, a sovereign government which is a political subdivision of the United Arab Emirates ("U.A.E."), and the Committee, an agency or instrumentality of the government of Dubai. Plaintiffs base their claims on (a) governmental acts performed by the government of Dubai in Dubai and (b) acts of the Committee on the purported grounds that the government of Dubai was the "alter ego" of the Committee.

The activities undertaken directly by the government of Dubai were the issuance of official Decrees in 1983 and 1984 by the then Deputy Ruler and the initiation of its purchase of what ultimately proved to be approximately 80% of the outstanding shares of the Union Bank of the Middle East ("UBME") in connection therewith. The Decrees were promulgated in response to the severe financial and economic problems which had arisen in Dubai as a result of the insolvency of defendant Galadari, a resident of Dubai, and companies owned or controlled by Galadari.

In February 1983, Galadari and Galadari Commodities ("Galadari") opened a number of trading accounts with Refco, an Illinois corporation. As of November 1983, Refco alleges that Galadari owed a debt of $4,609,664.20. Drexel originally brought an action for breach of contract in connection with a promissory note ("Note"). The Note was made in favor of Drexel Burnham Lambert International N.V. ("Drexel International") which was organized in the Netherlands Antilles and has its administrative offices in London, England. The Note, in the amount of $19,465,000.00, was executed on September 14, 1982, by defendant A.W. Galadari, both personally and on behalf of defendant A.W. Galadari Commodities, which was described as a partnership that Mr. Galadari managed. The Note was assigned to Drexel by Drexel International on October 28, 1982, the principal having been reduced by payment to $12,-465,000.00, was secured by 6,068,640 shares of the UBME, a bank which Galadari controlled.

Meanwhile in Dubai, Galadari was having severe financial problems stemming from the mismanagement of the UBME. On November 12, 1983, pursuant to a decree from the sovereign of Dubai (Decree No. 5), a Provisional Board of Directors of the UBME was created to manage the UBME. *See The Drexel Burnham Lambert Group, Inc. v. Galadari,* 84 Civ. 2602, 1987 WL 6164, 1987 U.S.Dist. Lexis 5030 (S.D.N.Y. Jan. 29, 1987) (*"Galadari II"*) at ¶ 18. Decree No. 5 provided for the vesting of the assets of Galadari and his companies in the Provisional Board, imposed a moratorium freezing all liabilities and be-

gan the liquidation of Galadari's assets.[1]

On April 17, 1984, Dubai issued Decree No. 3.[2] Decree No. 3 provided for insolvency proceedings in Dubai against Galadari and his companies by creating a Committee of Receivers to continue the work of the Provisional Board in managing and liquidating the non-banking businesses of Galadari, empowering it to marshal and liquidate the assets of Galadari and his companies, to adjudicate claims against the debtor estates and to pay out valid claims from those assets. *See Galadari II*, at ¶ 26. The Committee established a set of procedures which would allow for the submission of creditor's claims.

The Committee consists of Mr. Rostamani, a member of the business community of Dubai, Mr. Abdulla Lootah who is in charge of the purchasing section of the Federal Ministry of Finance, Mr. Hassan Ibn al Shiekh, vice-chairperson of the Chamber of Commerce of Dubai and Mr. Nabil Aref, director of the marine and road section of the Federal Ministry of Public Works. *Galadari II*, at ¶ 67–71.

Since the Committee's inception it has marshalled and liquidated the assets of the estate and processed creditors claims. *Galadari II*,87017211 at ¶ 72. Since the Committee's inception over 700 claims have been submitted in the aggregate amount of $770,000,000. *See* Declaration of Nabil Aref, dated Sept. 6, 1990, Exh. 12 to Reinthaler Aff at ¶ 6. Both Drexel and Refco have participated in the proceedings before the Committee in Dubai seeking recovery of debts owed by Galadari.

The central claims in the amended and supplemental complaint against Dubai and the Committee are that through the issuance of Decree No. 3 (and the creation of the Committee to assume control of and to marshal, liquidate and distribute the assets of Mr. Galadari and his various businesses), Dubai and the Committee confiscated the security interest and claims of Drexel and Refco.

This court has rendered several prior opinions which give more detailed background as to these proceedings.[3] Familiarity with these opinions is assumed for the purposes of this opinion. This matter is currently before the court on the motions of Dubai and the Committee to dismiss the amended and supplemental complaint of Drexel and Refco and on the motion of Drexel and Refco for a security against Dubai and the Committee to secure costs, judgment, and possible sanctions. These motions follow this court's June 1991 lifting of a stay that it had entered on January 29, 1987 and January 4, 1991 pending proceedings in Dubai.[4]

## III. SUBJECT MATTER JURISDICTION

### A. FOREIGN SOVEREIGN IMMUNITIES ACT

#### 1. Background/History of FSIA

The Foreign Sovereign Immunities Act ("the FSIA") was passed by Congress in

**1.** The Provisional Board was established to 1) act in place of the original board of directors in the day-to-day general management of the insolvent Union Bank, and 2) act as custodian of the non-banking business of A.W. Galadari. *Galadari II*, at ¶ 18.

**2.** *See* Decree No. 3 of 1984 concerning the financial affairs of Abdul Wahab Ebrahim Galadari, Exh. 1 to Reinthaler Aff. in support of the Committee's motion to dismiss the amended and supplemental complaints of plaintiffs The Drexel Burnham Lambert Group Inc. and Refco, Inc. ("Decree No. 3").

**3.** *See Drexel Burnham Lambert Group, Inc. v. Galadari*, 127 B.R. 87 (S.D.N.Y.1991); *Drexel Burnham Lambert Group, Inc. v. Galadari*, 134 B.R. 719 (S.D.N.Y.1991); *Refco v. Galadari*, 755 F.Supp. 79 (S.D.N.Y.1991); *Drexel Burnham Lambert Group, Inc. v. Galadari*, No. 84 Civ. 2602, 1987 WL 6164, 1987 U.S.Dist. Lexis 5030,

Jan. 29, 1987; *Drexel Burnham Lambert Group, Inc. v. Galadari*, No. 84 Civ. 2602, slip opinion, 1986 WL 4692, Apr. 17, 1986; *Drexel Burnham Lambert Group, Inc. v. Galadari*, 610 F.Supp. 114 (S.D.N.Y.), *aff'd in part and vacated in part*, 777 F.2d 877 (2d Cir.1985).

**4.** *See The Drexel Burnham Lambert Group, Inc. v. Galadari*, Nos. 84 Civ. 2602, 90 Civ 2140, *Order Vacating The Stays of Proceedings*, S.D.N.Y., *filed* June 28, 1991. *See also The Drexel Burnham Lambert Group, Inc. v. Galadari*, 134 B.R. 719, *Opinion Re Vacating the Stay: Findings of Fact And Conclusions of Law*, (S.D.N.Y.1991); *The Drexel Burnham Lambert Group, Inc. v. Galadari*, 127 B.R. 87, *Supplemental Opinion Re Vacating the Stay: Supplemental Findings of Fact And Conclusions of Law* (S.D.N.Y.1991).

1976 to codify standards for the judicial treatment of foreign sovereigns and their agencies and instrumentalities.[5] For more than a century and a half prior to the enactment of the FSIA, courts in this country had generally granted complete immunity to foreign sovereigns or deferred to the decisions of the Executive Branch. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486–87, 103 S.Ct. 1962, 1967–68, 76 L.Ed.2d 81 (1983) (FSIA not unconstitutional in authorizing foreign plaintiff to sue foreign state in federal court on nonfederal claim).

In 1952, the State Department adopted the Tate Letter,[6] calling for the application of a "restrictive" theory of foreign sovereign immunity. The restrictive theory of sovereign immunity allows immunity for the public acts of a foreign sovereign while the commercial acts or private acts of a foreign sovereign are not immune. *Verlinden*, 461 U.S. at 487, 103 S.Ct. at 1968; *See also Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F.Supp. 1165, 1169 (D.Md. 1978). Because the restrictive theory was not initially codified, court decisions regarding immunity were made upon recommendations from the State Department that were often shaped by diplomatic pressures from foreign nations. As a result, the case-by-case application of the restrictive theory in matters involving foreign sovereign immunity lacked uniformity and equity. *See Verlinden*, 461 U.S. at 487–88, 103 S.Ct. at 1968. Congress, therefore, passed the FSIA in order to free the Government from the case-by-case diplomatic pressures of Executive Branch directed determinations, to clarify the applicable standards, and to ensure due process in matters involving foreign sovereigns. *Verlinden*,

461 U.S. at 488, 103 S.Ct. at 1968; *See also Jet Line Services*, 462 F.Supp. at 1170.

The FSIA codifies as federal law the restrictive theory of sovereign immunity. *Verlinden*, 461 U.S. at 488, 103 S.Ct. at 1968. In most instances, foreign states are immune from the jurisdiction of the United States courts. Exceptions to that general rule include cases in which the foreign state has explicitly or implicitly waived its immunity or in which the foreign state has engaged in commercial activity or when one of the other specified exceptions of the FSIA applies. *Verlinden*, 461 U.S. at 488, 103 S.Ct. at 1968. In such exceptional cases, the foreign state is "liable in the same manner and to the same extent as a private individual under like circumstances." *Verlinden*, 461 U.S. at 488–89, 103 S.Ct. at 1968–69 (*quoting* FSIA 28 U.S.C. § 1606).

### 2. FSIA Is Sole Source of Jurisdiction—Dubai Law Does Not Apply

[1, 2] The FSIA provides the sole basis for jurisdiction in matters involving a foreign sovereign or its agent or instrumentality. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). In *Argentine Republic*, which involved a suit for damage done to a Liberian oil tanker that was attacked by Argentine military aircraft during the war between Great Britain and the Argentine Republic over the Falkland Islands, the Supreme Court ruled that "the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic*, 488 U.S. at 434, 109 S.Ct. at 687; *Republic of Argentina and Banco Central de la Republica Argentina v.*

5. Title 28 U.S.C. § 1330 provides:
 (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under section 1605–1607 of this title or under any applicable international agreement.
 (b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over

which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

6. Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dept. of State Bull. 984–985 (1952), and in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 711, 96 S.Ct. 1854, 1869, 48 L.Ed.2d 301 (1976) (Appendix 2 to opinion of White, J.).

*Weltover, Inc.,* 504 U.S. ——, ——, 112 S.Ct. 2160, 2164, 119 L.Ed.2d 394, 403 (1992) ("The FSIA provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States"). In determining that the FSIA provides the sole basis for jurisdiction, the Court ruled out the applicability of other statutes to cases involving a foreign sovereign or its instrumentality. For example, the Court ruled that neither the Alien Tort Statute[7] nor general admiralty and maritime law could be applied to determine jurisdiction in such cases. *Argentine Republic,* 488 U.S. at 439, 109 S.Ct. at 690.

Defendant Committee of Receivers argues in this case that Dubai law should apply for jurisdictional purposes. The Committee asserts that Article 9 of Decree No. 3[8] immunizes the Committee from liability in this court. Dubai law and Decree No. 3, however, do not apply here and are not relevant to this issue. In addition to the Supreme Court's decision in *Argentine Republic,* holding that the FSIA is the sole basis for jurisdiction, the Second Circuit held in *Letelier v. Republic of Chile,* 748 F.2d 790 (2d Cir.1984) that the FSIA is "the exclusive source of subject matter jurisdiction over all suits involving foreign states or their instrumentalities." *Letelier,* 748 F.2d at 793 (involving suit against the Republic of Chile and Chilean nationals that Chilean government refused to extradite who had been indicted for the assassination of the former Chilean Ambassador to the United States and his wife) (*citing Rex v. CIA Pervana de Vapores, S.A.,* 660 F.2d 61, 62 (3d Cir.1981), *cert. denied* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982)). It is therefore clear from the decisions in *Argentine Republic* and *Letelier* that Dubai law cannot be applied to the question of jurisdiction. Subject matter jurisdiction in

this case is governed by the FSIA and its specific exceptions to immunity.

## B. COMMITTEE AND DUBAI HAVE BURDEN OF PROVING ENTITLEMENT TO IMMUNITY

In asserting that this court lacks subject matter jurisdiction, defendants' have the burden of proving that the exceptions posed by plaintiffs do not apply. *See e.g., Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 707–08 (9th Cir.1992); *See also L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 119 (S.D.N.Y.1988) ("Under the FSIA, defendants bear the evidentiary burden of demonstrating that the exceptions are not applicable"). *Siderman* involved a suit against the Republic of Argentina and the Argentine Province of Tucuman for the torture and expropriation of property of one of its citizens. The Ninth Circuit noted that when the allegations in the complaint bring claims within an FSIA exception, the burden shifts to the foreign state or instrumentality to prove that any relevant exceptions do not apply. *Siderman,* 965 F.2d at 707–08. " 'Once the plaintiff offers evidence that an FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply.' " *Siderman,* 965 F.2d at 708 (*quoting Schoenberg v. Exportadora de Sal, S.A. de C.V.,* 930 F.2d 777 (9th Cir.1991) (*quoting Joseph v. Office of the Consulate Gen'l of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987) *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988))).

Plaintiffs, however, are not wholly without responsibility in resolving the issue of subject matter jurisdiction. The burden of proof is a shifting burden which ultimately falls upon the party claiming immunity.[9] Once a party has established

---

7. The Alien Tort Statute provides:

 The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States 28 U.S.C. § 1350.

8. Article 9 of Decree No. 3 provides:

No liability personal or otherwise shall attach to the ... Committee, or their advisors and agents ... in respect of acts performed in accordance with this Decree.

9. The legislative history of the FSIA suggests a shifting burden of proof:

 [T]he burden will remain on the foreign state to produce evidence in support of its claim of

that it is a foreign state within the meaning of the FSIA and potentially entitled to immunity, the burden shifts to the opposing party to raise the applicable exceptions to sovereign immunity and supporting facts. *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana,* 923 F.2d 380, 390 n. 14 (5th Cir.1991) (In suit for breach of contract and negligent misrepresentation against nationalized Mexican petroleum company and business entity, plaintiff must raise applicable exception to immunity). Upon a demonstration of the applicable exceptions, the ultimate burden shifts back to the foreign state to prove that the exceptions raised do not apply. *Stena Rederi,* 923 F.2d at 390 n. 14; *See also Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 289 n. 6 (5th Cir.1989) (While plaintiffs had burden of production subsequent to foreign state's prima facie immunity, "the ultimate burden of persuasion remained at all times on [the foreign state]"); *Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195, 199 (5th Cir.1984) (party claiming FSIA immunity has burden of proving nonapplicability of exceptions). *See e.g., Transamerican Steamship Corp. v. Somali Democratic Republic,* 767 F.2d 998, 1003 (D.C.Cir.1985) (where foreign state failed to sustain burden of proving inapplicability of exception,

district court had jurisdiction); *Alberti v. Empresa Nicaraguense de la Carne,* 705 F.2d 250, 253 (7th Cir.1983) ("It is uncontested that defendants bear the burden of establishing their immunity from suit").

In this case, both defendant Committee and defendant Dubai have met their burden of demonstrating a *prima facie* entitlement to immunity by establishing that they are "foreign state[s]" [10] within the meaning of the FSIA. *See Refco, Inc. v. Galadari,* 755 F.Supp. 79, 82 (S.D.N.Y.1991) ("This court ... finds that the Committee is an agency or instrumentality of a foreign state"). Plaintiffs, however, have met their subsequent burden of presenting evidence indicating the applicability of an exception to immunity provided for in the FSIA.[11] The ultimate burden, therefore, now falls on the defendants to prove to the court the inapplicability of any of the FSIA exceptions.

## C. DEFENDANT, COMMITTEE, IMPLICITLY WAIVED IMMUNITY

■ One of the FSIA exceptions to immunity that plaintiffs raise is the waiver exception. The FSIA § 1605(a) provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(b) An "agency or instrumentality of a foreign state" means any entity—
(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

immunity. Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state—that is, an act not within the exceptions in section 1605–1607. Once the foreign state has produced such *prima facie* evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity. The ultimate burden of proving immunity would rest with the foreign state. H.R.Rep. No. 1487, 94 Cong., 2d Sess. 1, 17, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6616.

10. FSIA § 1603 states:
(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

11. Plaintiffs claim defendants have waived immunity. FSIA § 1605(a)(1). Plaintiffs claim defendants engaged in commercial activities. FSIA § 1605(a)(2). Plaintiffs claim defendants engaged in a taking of property in violation of international law. FSIA § 1605(a)(3).

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

With regard to this provision, the first issue to be resolved is the constitution of an implied waiver. Upon that determination, the issue turns to whether the acts of the Committee and Dubai comprise an implicit waiver.

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir.1991) involved an appeal from a district court's dismissal of a suit brought against the Republic of Bolivia for nonpayment of a note. In concurring in the district court's opinion with regard to waiver and holding that suit brought by a foreign state in a particular matter did not constitute waiver of immunity with respect to associated but distinct claims,[12] the Second Circuit defined the composition of an implied waiver under the FSIA. The court observed that "Federal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly." *Shapiro*, 930 F.2d at 1017 (citations omitted). Referring to the legislative history of the FSIA, the court noted three specific examples of actions constituting an implied waiver. The court quoted the House Report which states:

> With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. *An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.*

H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6617 (*quoted in Shapiro,* 930 F.2d at 1017) (emphasis added). The court in *Shapiro* observed that "[t]hese examples involve circumstances in which the waiver was unmistakable, and courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous." *Shapiro,* 930 F.2d at 1017. According to *Shapiro,* then, filing a responsive pleading without raising the defense of sovereign immunity constitutes an "unambiguous" implied waiver of immunity.

In addition to the Second Circuit's decision in *Shapiro,* there is other support for finding an implied waiver where a foreign state files responsive pleadings without preserving its immunity. In considering an appeal of the district court's granting a motion to dismiss on sovereign immunity grounds, the Second Circuit in *Canadian Overseas Ores LTD v. Compania de Acero del Pacifico S.A.,* 727 F.2d 274 (2d Cir. 1984) noted that "sovereign immunity is an 'affirmative defense which must be specially pleaded' for a court to consider it." *Canadian Overseas Ores,* 727 F.2d at 277.

---

**12.** The result in *Shapiro,* finding no implied waiver, is distinguished from the present case on its facts. In *Shapiro,* the Republic of Bolivia issued negotiable promissory notes guaranteed by the Central Bank of Bolivia in exchange for Starfighter jets. When the State Department refused the transfer of the jets, Bolivia requested the return of the notes. Not all of the notes were returned, however, and Bolivia brought suit in the Southern District of New York to recover the notes or compensable damages from the company handling the transfer of the jets. The district court ruled in Bolivia's favor and against the company on summary judgment, but the company filed for chapter 7 bankruptcy without returning any of the outstanding notes.

Meanwhile, Shapiro, a holder of one of the outstanding notes, filed suit in the Southern District against Bolivia, the Bolivian Air Force, and the Central Bank of Bolivia because the Central Bank had refused payment of the note that he held.

The Second Circuit held that Bolivia's suit to recover its notes from the company did not constitute waiver for the purposes of the FSIA in a separate suit brought against Bolivia by a third party concerning a separate related transaction. (The court, nevertheless, went on to hold that Bolivia was not immune because it had engaged in commercial activity.)

The case here, however, involves no suit by a third party and stems from one set of transactions—the failure of Drexel and Refco to be satisfied in the repayment of the debts owed to the them by Galadari.

Where a foreign state responds without specifically pleading the sovereign immunity defense, it implicitly waives its immunity; the filing of a pleading is the point of "no return" for asserting sovereign immunity. *Canadian Overseas Ores,* 727 F.2d at 277.[13] *See also Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1058 (S.D.N.Y.1979) (quoting House Report for proposition that responsive pleading without immunity defense constitutes waiver); *Aboujdid v. Singapore Airlines, LTD,* 67 N.Y.2d 450, 503 N.Y.S.2d 555, 494 N.E.2d 1055 (Ct.App.1986) ("An entity otherwise entitled to sovereign immunity under the FSIA which serves an answer asserting not only a number of affirmative defenses other than sovereign immunity but also a counterclaim against plaintiffs and their counsel, and in furtherance of its position utilizes a number of procedural devises before attempting some four and a half years after commencement of the litigation to amend its answer to assert the immunity defense, waives immunity ..."); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 477 F.Supp. 615, 619 n. 9 (S.D.N.Y.1979), *rev'd on other grounds,* 629 F.2d 786 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) (where defendant did not raise sovereign immunity defense in responsive pleadings, defendant implicitly waives immunity).

Having firmly established that participation in litigation without claiming sovereign immunity constitutes waiver, the next task is to determine whether or not the Committee has waived its immunity in this case.

### 1. The Committee Entered As Party To Litigation

The procedural history of this case indicates that the Committee has not met its burden of proving that the FSIA waiver exception is inapplicable. The original claims of Drexel and Refco were against Galadari, a private citizen of Dubai. When Galadari experienced financial trouble that the government of Dubai felt warranted intervention, Dubai established the Provisional Board and then the Committee, which voluntarily intervened as an agent of Dubai on behalf of Galadari and Galadari's company, Commodities, in these proceedings.

Since entering this litigation, the Committee has actively participated in defending Galadari and Commodities against the claims of Drexel and Refco. Rather than making a special pleading, which the Second Circuit in *Canadian Overseas Ores* noted was necessary to preserve immunity,[14] the Committee made a general appearance in this action in 1984, as found by the Second Circuit in *The Drexel Burnham Lambert Group Inc. v. Galadari,* 777 F.2d 877, 880 (2d Cir.1985):

> In response to Drexel's suit upon the promissory note, the Committee appeared generally and asserted twenty-five affirmative defenses.

In other words, the Committee pleaded everything that it could think of to derail Drexel's claim, but it did not plead sovereign immunity.

Similarly, in the Refco action, the Committee appeared in 1984 and opposed Refco's motion for an order of attachment without raising the issue of sovereign immunity. (Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended and Supplemental Complaints ("Pls.Opp.Mot.Dis.") at 18). The Committee argued that Refco's motion should be denied or stayed upon comity principles. Pls.Opp.Mot.Dis. at 18. The Committee succeeded in obtaining Refco's agreements to adjourn the action based on its continuing representations to Refco that Refco's claim be considered together with Drexel's and that Refco could rely on the

---

13. While the court in *Canadian Overseas Ores* held that the Chilean corporation had not waived its immunity by filing various *motions,* the court concluded that "the defense of sovereign immunity is lost if not made in the first responsive *pleadings.*" *Canadian Overseas Ores,* 727 F.2d at 277 (emphasis added).

14. *Canadian Overseas Ores,* 727 F.2d at 277 ("sovereign immunity is an 'affirmative defense which must be specifically pleaded' ").

Committee's dealings with Drexel as if they were dealings with Refco. Pls. Opp.Mot.Dis. at 18. In fact, because of the Committee's participation in the state court proceedings brought by Refco, the New York court acted to add the Committee, *sua sponte,* as a party to the case. *See* Memorandum of Law in Support of the Committee of Receivers Motion to Dismiss ("Comm.Mot.Dis.") at 36.

Moreover, this court determined that the Committee is a party in this litigation in ruling on Drexel's application for a preliminary injunction. This court noted that neither of the named defendants, Galadari or Commodities, had appeared; rather the Committee "appeared" and answered instead. *See The Drexel Burnham Lambert Group, Inc. v. Galadari,* 84 Civ. 2602, slip opinion, 1986 WL 4692, April 17, 1986 (*"Galadari I"*) at 1.

### 2. Dubai And The Committee Are The "Real Parties In Interest" As To Galadari's Assets

■ The Committee argues that it entered this litigation solely on behalf of Galadari and his companies and that it was not essential for the Committee to raise the immunity defense until the Committee had appeared on its own behalf, "qua Committee." This argument is unpersuasive, however, because the Committee and Dubai are the "real parties in interest" in this litigation.

The term "real party in interest" generally refers to "the one who, under the applicable substantive law, has the legal right which is sought to be enforced or is the party entitled to bring suit." *In re Comcoach Corp.,* 698 F.2d 571, 573 (2d Cir.1983). When Dubai assumed control of the UBME, it became the real party in interest as to those assets.

In *Banco Nacional de Cuba v. Chemical Bank New York,* 658 F.2d 903, 910–11 (2d Cir.1981), the Second Circuit held that a country that expropriated a private bank and assigned management of the bank to an agent, was the real party in interest as to the bank. Here, therefore, Dubai, which took control of the UBME and assigned its management to the Provisional Board, is

the real party in interest as to Galadari's banking interest, some of which were used to secure the Drexel Note.

When the Committee assumed the responsibility of marshalling and liquidating Galadari's assets, it became the real party in interest as to those assets. Under New York law, a liquidator is the real party in interest as to the assets and interests for which he or she is responsible. *See e.g. United States Fidelity & Guaranty Company v. Executive Ins. Co.,* 893 F.2d 517, 518 n. 1 (2d Cir.1990) (appointed liquidator is real party in interest).

In *Fabe v. Aneco Reinsurance Underwriting Ltd.,* 784 F.Supp. 448 (S.D.Ohio 1991), a district court in another circuit confronted a similar situation. In *Fabe,* the liquidator of an oil and gas insurance company brought suit against the liquidators of the defendant reinsurance company who were appointed by the Chief Justice of the Supreme Court of Bermuda to marshal the assets of the reinsurance company and wind up its affairs. In this context, the court determined that "once [the reinsurance company] was ordered into liquidation, the real party in interest in this action became, not the corporation, but the liquidators of the corporation appointed by the Supreme Court of Bermuda." *Fabe,* 784 F.Supp. at 450.

Similarly, the Committee, appointed as liquidator to marshal and wind up the affairs of Galadari and his companies, is the real party in interest as to Galadari's non-banking assets. The court in *Fabe* noted that the "liquidators are vested with all interests and property of the estate in liquidation and legal proceedings may be prosecuted or defended in the liquidator's name." *Fabe,* 784 F.Supp. at 450. The Committee, when it appeared as liquidator of Galadari's assets, appeared as the real party in interest, "qua Committee." Because it failed to raise the defense of sovereign immunity when it appeared and responded as real party in interest, the Committee waived its immunity.

Because the Committee voluntarily intervened as the real party in interest in both federal and state proceedings and filed re-

sponsive pleading without preserving its right to sovereign immunity, the Committee has failed to meet its burden of proving that it did not implicitly waive its right to immunity. Additionally, because Dubai is the real party in interest as to Galadari's banking assets and appeared through its agent the Committee without preserving immunity, Dubai has failed to meet its burden of proving that it did not implicitly waive immunity. This court, therefore, has subject matter jurisdiction under the waiver exception of the FSIA as to both the Committee and Dubai.

### D. DEFENDANTS, COMMITTEE AND DUBAI, ARE NOT IMMUNE FROM JURISDICTION BECAUSE IT ENGAGED IN COMMERCIAL ACTIVITY HAVING A DIRECT EFFECT IN THE UNITED STATES

■ While the applicability of only one of the FSIA exceptions is sufficient for subject matter jurisdiction, it should be noted that the commercial activity exception is also a factor in this case. Another of the FSIA exceptions to immunity that plaintiffs raise is the commercial activity exception. The FSIA § 1605(a) provides that a foreign state is not immune from suit in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

FSIA § 1605(a)(2).

"Commercial activity" is defined in the FSIA as

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

FSIA § 1603(d).

In *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981), which involved breach of contract claims brought by suppliers of Portland cement against the nation of Nigeria, the Second Circuit set some of the parameters of "commercial activity." The court determined that the words "regular course of ... conduct" in the FSIA definition of "commercial activity" should be interpreted broadly to encompass a wide range of acts as the relevant activities in a given matter. *Texas Trading,* 647 F.2d at 308.[15] In *Weltover,* the Supreme Court dealt with the issuance of debt instruments by the Argentine government. Referring to the Supreme Court's first decision concerning the FSIA in *Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48

---

**15.** It should be noted, as the court noted in *Texas Trading,* that the FSIA provides almost no guidance as to the meaning and scope of "commercial." While "commercial activity" is defined as a regular course of commercial conduct or transaction, no provision of the FSIA defines "commercial." *See Texas Trading,* 647 F.2d at 308; *Weltover,* 504 U.S. at ——, 112 S.Ct. at 2164, 119 L.Ed.2d at 404 (FSIA leaves "commercial" largely undefined).

In evaluating whether or not Nigeria had engaged in commercial activity in procuring cement to build that nation's infrastructure, the court in *Texas Trading* referred to three sources for standards of commercial activity with regard to Nigeria's repudiation of its contracts. The first source was statements from the legislative history concerning contracts. The second

source was the case law that existed at the time the FSIA was passed which indicated that immunity could not be "claimed with respect to acts or transactions that are commercial in nature, regardless of their underlying purpose." *Texas Trading,* 647 F.2d at 309 (*citing* Hearings on H.R. 3493 Before Subcommittee on Claims and Governmental Relations of the House Committee on the Judiciary, 93rd Cong., 1st Sess. 16 (1973) (testimony of Charles N. Brower, Legal Adviser, Department of State)). The third source was international law indicating that international law follows the restrictive theory which does not permit foreign states to claim immunity for their commercial acts and allows levying on commercial property for the satisfaction of judgments. *See Texas Trading,* 647 F.2d at 310, 310 n. 28.

L.Ed.2d 301 (1976),[16] the *Weltover* Court concluded:

> that when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA.

*Weltover*, 504 U.S. at ——, 112 S.Ct. at 2165, 119 L.Ed.2d at 405. Thus, if Dubai or the Committee pursued a course of conduct, transaction or act that a private player would pursue, then they engaged in commercial activity for the purpose of the FSIA exception.

■ In determining whether a course of conduct or a particular act or transaction is commercial activity, the court must look to the nature of the activity rather than the purpose.[17] The Court in *Weltover* interpreted this statutory distinction to mean that

> the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce"

*Weltover*, 504 U.S. at ——, 112 S.Ct. at 2165, 119 L.Ed.2d at 405 (*quoting* BLACKS LAW DICTIONARY 270 (6TH ED 1990)). The question, then, is not whether the *purpose* of Dubai's and the Committee's activities was governmental or judicial; rather the question is whether the *nature* of the activities themselves were such that they could be performed by private parties.

In applying the commercial activity exception the first task is to define the relevant conduct. *Texas Trading*, 647 F.2d at 308. *See also Braka v. Bancomer*, 589 F.Supp. 1465, 1469 (S.D.N.Y.1984). The commercial activities in this case all involve the marshalling, liquidating and winding up of Galadari's assets. Specifically, Dubai took over and provided for the management of the UBME, a private bank. The Committee, in addition to its quasi judicial function, managed and wound up Galadari's non-banking businesses and assets. Many of these activities occurred outside of the United States, and thus, fall under the third clause of the commercial activity exception.

The Court in *Weltover* ruled that analysis of the third clause of the commercial activity exception involves the following considerations: 1) whether the lawsuit is " 'based . . . upon an act outside the territory of the United States'; 2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and 3) that 'cause[d] a direct effect in the United States.' " *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2164, 119 L.Ed.2d at 403 (*quoting* FSIA 28 U.S.C. § 1605(a)(2)).

### 1. Commercial Activity Claims Are Based Upon Acts Outside Of The Territory Of The United States

Many of the relevant acts of Dubai and the Committee took place outside of the United States. It is undisputed that Dubai took over and provided for the management, via the Provisional Board, of Galadari's private bank in Dubai.[18] It is undisputed that Dubai provided a sum of money to be paid to the UBME's creditors, many of whom were residents of Dubai.[19] It is

---

**16.** The Court in *Dunhill* held that a foreign state may not be entitled to immunity where suit was "based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation. A foreign state engaging in 'commercial' activities 'do[es] not exercise powers peculiar to sovereigns; rather, it 'exercise[s] only those powers that can also be exercised by private citizens.' " *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2164–65, 119 L.Ed 2d at 404–05 (*quoting Dunhill*, 425 U.S. at 698–705, 96 S.Ct. at 1863–1866).

**17.** The FSIA § 1603(d) provides:

> The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

**18.** Galadari had pledged 6,068,640 shares of the UBME as security for the Note held by Drexel. Pls.Opp.Mot.Dis. at 5.

**19.** Drexel's Note was not repaid, however, because when Drexel sought repayment from the Provisional Board, its chairperson refused repayment claiming that Drexel's Note represent-

undisputed that the Committee marshalled, managed, and liquidated Galadari's assets in Dubai and countries other than the United States.

2. The Acts Of Dubai And The Committee Were Taken In Connection With A Commercial Activity Outside Of The United States

The relevant acts of Dubai were not only acts outside of the territory of the United States, satisfying the first aspect of the requirements of the third clause of the commercial activity exception, they were also acts taken in connection with a commercial activity outside of the United States. When Dubai took over and provided for the management of the UBME, it engaged in a commercial activity in Dubai. Dubai engaged in an act that could have been conducted by a private party—in fact, which had previously been conducted by a private party, namely Galadari. Therefore, Dubai engaged in a commercial activity in Dubai, satisfying the second aspect of the requirements of the third clause of the commercial activity exception as to Dubai.

When the Committee marshalled, managed, and liquidated Galadari's assets, it engaged in commercial activities outside of the United States. The Committee engaged in activities that could have been conducted and were conducted, previously, by a private party. For example, for a time, the Committee operated Galadari's hotel in Singapore. *See* Transcript of Argument on Motion to Dismiss ("Tr.") at 38. Therefore, the Committee engaged in commercial activities outside the United States, satisfying the second aspect of the requirements of the third clause of the commercial activity exception as to the Committee.

3. The Committee's Commercial Activity Had A Direct Effect In The United States

The final requirement of the third clause of the commercial activity exception is that the act in connection with commercial activity had a direct effect in the United States. *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2166, 119 L.Ed.2d at 407.

The Court in *Weltover* dealt specifically with the issue of what constitutes a direct effect. The Court noted that the Second Circuit in that case had rejected the suggestion in the legislative history of the FSIA that a "direct effect" must be "substantial" and "foreseeable." *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2166, 119 L.Ed.2d at 407. The Court affirmed the lower court's interpretation, explicitly rejecting any suggestion that the direct effect requirement of the third clause of § 1605(a)(2) "contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2166, 119 L.Ed.2d at 407. The Court concluded that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.'" *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2166, 119 L.Ed.2d at 407 (*quoting Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir.1991). In this context, the Court had "little difficulty" concluding that the rescheduling of the maturity dates of Argentine debt instruments had a "direct effect" in the United States. *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2166, 119 L.Ed.2d at 408. Specifically, the Court concluded that a "direct effect" in the United States exists where money that is payable in the United States is not paid due to the commercial activity of a foreign state. *Weltover*, 504 U.S. at ——, 112 S.Ct. at 2166, 119 L.Ed.2d at 408.

The actions of Dubai and the Committee had a "direct effect" in the United States. As in *Weltover*, the situs of the debt in this case is in the United States, specifically, New York. The Note held by Drexel was payable in the United States and by its terms is subject to the jurisdiction of this court. Pls.Opp.Mot.Dis. at 5. The acknowledgment of debts between Refco and Galadari and Drexel and Galadari were negotiated and executed in New York. Pls. Opp.Mot.Dis. at 5.

Part of the purpose of the commercial activity exception is to create equity between companies and foreign states that become involved in commercial activity.

ed "gambling losses" and were therefore unworthy of payment. Pls.Opp.Mot.Dis. at 7.

Where a company loans money to a foreign entity and takes precautions to have disputes adjudicated in the United States, then the FSIA will not immunize a foreign state that becomes involved in that commercial transaction from a fair adjudication. When Dubai and the Committee took over the control and management of Galadari's assets and refused to pay debts owed Drexel and Refco and payable in the United States, Dubai and the Committee produced a "direct effect" in the United States.

The commercial activity exception applies in this case. As required by the third clause of the commercial activity exception, Dubai and the Committee engaged in activities outside the United States in connection with commercial activity outside the United States that had a direct effect in the United States. Therefore, Dubai and the Committee have waived their immunity according to the commercial activity exception, and this court has subject matter jurisdiction.

## IV. PERSONAL JURISDICTION

■ Personal jurisdiction under the FSIA is a matter separate and apart from the issue of subject matter jurisdiction. *See Texas Trading*, 647 F.2d at 313 (issue of personal jurisdiction is subsequent to determination of subject matter jurisdiction). *See also Walpex Trading v. Yacimientos Petroliferos*, 712 F.Supp. 383, 390 (S.D.N.Y.1989) ("Personal jurisdiction over foreign sovereign instrumentalities under the FSIA involves a scrutiny distinct from ... subject matter jurisdiction"). Personal jurisdiction under the FSIA is statutorily defined as well as being governed by constitutional due process requirements. *See Walpex Trading*, 712 F.Supp. at 390 (Congress did not override constitutional due process requirements in drafting the FSIA).

In terms of what the statute requires, FSIA § 1330(b) states:

Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) [providing for subject matter jurisdiction] where service has been made under section 1608.[20]

**20.** Subsection (a) of FSIA § 1330, regarding subject matter jurisdiction, is discussed above.

FSIA § 1608, regarding service, states:

(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United State; or in accordance with an applicable international convention on service of judicial documents; or

Thus, according to the statute, personal jurisdiction exist where there is both subject matter jurisdiction and service. *See Shapiro,* 930 F.2d at 1020 ("Under the FSIA, ... personal jurisdiction equals subject matter jurisdiction plus valid service of process."); *Texas Trading,* 647 F.2d at 313 (statute provides for "personal jurisdiction over the foreign state as to any claim the district court has power to hear under § 1330(a), so long as service has been made under § 1608.")

As discussed above, this court has subject matter jurisdiction over both Dubai and the Committee. There is no dispute concerning the validity of service. *See* Stipulation and Order, March 17, 1992, at ¶ 2.; Emirate Mem. at 74 n. 38. There being both subject matter jurisdiction and valid service, the statutory requirements for personal jurisdiction are satisfied.

In addition to statutory requirements, however, the constitutional due process requirements for personal jurisdiction must also be met. *See Shapiro,* 930 F.2d at 1020 (there exist constitutional constraints on personal jurisdiction under FSIA). The Constitution requires that there be sufficient "minimum contacts" between the for-eign state and the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *See Shapiro,* 930 F.2d at 1020 (*citing International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).[21]

In this case, the constitutional requirements for personal jurisdiction were satisfied when the Committee voluntarily entered and participated in this litigation, thus waiving any subsequent claim to lack of personal jurisdiction. *Grammenos v. Lemos,* 457 F.2d 1067, 1070 (2d Cir.1972) ("If a party enters a case, makes no objection to jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection [to jurisdiction].") (citations omitted).

Moreover, the Committee's general appearance and participation implicates Dubai. The Second Circuit in *Texas Trading* noted that "it is not only defendant's activities in the forum, but also action relevant to the transaction by an agent on defendant's behalf, which support personal juris-

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be serve, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

(c) Service shall be deemed to have been made—

(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes [its] claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

*See also Bowers v. Transportes Navieros Ecuadorianos,* 719 F.Supp. 166, 169 (S.D.N.Y.1989) (discussing service requirements for personal jurisdiction).

**21.** *See also Walpex Trading,* 712 F.Supp. at 390 (discussing requirements for specific and general jurisdiction and noting that "[u]nder the FSIA, contacts with the entire United States, as opposed to a particular state or forum, are relevant." *citing Verlinden,* 461 U.S. at 490, 103 S.Ct. at 1969). *See also Texas Trading,* 647 F.2d at 314 (regarding service under § 1608, entire United States is relevant in delineating contact).

diction." *Texas Trading,* 647 F.2d at 314 (*citing Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 120–21 (2d Cir.1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968) (commercial activity of agent is chargeable to principle); *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 538, 281 N.Y.S.2d 41, 44–45, 227 N.E.2d 851, 853–854. *But see Carey v. National Oil Corp.,* 592 F.2d 673 (2d Cir. 1979) (dismissing for lack of jurisdiction where minimum contacts did not exist, finding that the actions of principle do not apply to the agent).

Therefore, according to *Texas Trading,* the Committee's general appearance and contacts applies to Dubai, and Dubai can be said to have waived claims concerning lack of personal jurisdiction.

In addition to the Committee's and Dubai's waiver of personal jurisdiction, both the Committee and Dubai have sufficient minimum contacts for due process, that is so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Texas Trading,* 647 F.2d at 314 (*quoting International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158). In evaluating a defendant's minimum contacts,

> the court must examine the extent to which defendants availed themselves of the privileges of American law, the extent to which litigation in the United States would be foreseeable to them, the inconvenience to defendants of litigating in the United States, and the countervailing interest of the United States in hearing the suit.

*Texas Trading,* 647 F.2d at 314 (citations omitted).

Defendants in this case have sufficient minimum contacts for due process. The Committee as agent of Dubai voluntarily entered litigation in this court. Tr. at 81. The Committee requested affirmative relief, cost disbursements, and attorneys' fees. Tr. at 81. The Committee paid a judgment for costs on appeal that was entered by the Second Circuit. Tr. at 81. The Committee took discovery in this jurisdiction. Tr. at 81. And the debt at the heart of all of this litigation was negotiated and executed in the United States. In other words, defendants have had sufficient contact with the United States to satisfy due process.

Given the waiver by defendants of personal jurisdiction and given the minimum contacts of defendants, this court may constitutionally assume personal jurisdiction over both defendants.

Both the statutory and constitutional requirements being satisfied, this court has personal jurisdiction over both defendant Dubai and defendant the Committee.

## IV. THE ACT OF STATE DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants also argue that plaintiffs' amended and supplemental complaint should be dismissed according to the Act of State Doctrine. The Act of State Doctrine states:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*See Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 1859 n. 7, 48 L.Ed.2d 301 (1976) (*citing Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897)). The purpose of the Act of State Doctrine is to avoid the adjudication of actions that foreign states take on their own soil that might embarrass the Executive Branch or interfere with foreign policy. *See Dunhill,* 425 U.S. at 698, 96 S.Ct. at 1863, 48 L.Ed.2d at 313.[22]

---

**22.** Perhaps it should also be noted that the Act of State Doctrine is non-jurisdictional. *Friedar v. Government of Israel,* 614 F.Supp. 395, 399 (S.D.N.Y.1985); *Dayton v. Czechoslovak Social-* *ist Republic,* 672 F.Supp. 7, 11 (D.D.C.1986). As a result, the application of the Act of State Doctrine is discretionary. *Friedar,* 614 F.Supp. at 399.

In *Dunhill,* the Court considered the confiscation by the Cuban government of the businesses and assets of certain Cuban cigar manufacturers. The Cuban government named "intervenors" [managing agents] to operate the seized businesses. When importers made payments for pre-intervention shipments to the interventors, the former owners brought suit in the United States. The Cuban interventors and the Republic of Cuba were permitted to join. The Court concluded that the Act of State Doctrine did not apply because the case involved acts which were commercial rather than public in nature. *Dunhill,* 425 U.S. at 698, 96 S.Ct. at 1863, 48 L.Ed.2d at 313.

Both Dubai and the Committee were engaged in commercial activity, as determined above. Therefore, according to *Dunhill,* the Act of State Doctrine may not be raised to debar this court's adjudication.[23] Moreover, the Court in *Dunhill* noted that "[r]epudiation of a commercial debt cannot, consistent with this restrictive approach to sovereign immunity, be treated as an act of state." 425 U.S. at 698, 96 S.Ct. at 1863, 48 L.Ed.2d at 314. The repudiation of the debts owed to Drexel and Refco in this case is therefore not an act of state.

In addition to the determination that defendants' acts were commercial, and therefore not acts of state, other details concerning defendants' transactions preclude the application of the Act of State Doctrine. The Second Circuit has determined that where the situs of the debt is in the United States, the Act of State Doctrine does not

prevent creditors from recovering for their losses. *Allied Bank International v. Banco Credito Agricola de Cartoago,* 757 F.2d 516 (2d Cir.1985), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).[24] The situs[25] of the debts as to both Drexel and Refco in this case is the United States. The Note held by Drexel was payable in the United States. The acknowledgment of debt between Refco and Galadari was negotiated in New York. The Act of State Doctrine, therefore, does not govern this case or intimate its dismissal.

## V. THE COMMITTEE'S ACTS EXTEND BEYOND ITS JUDICIAL OR QUASI-JUDICIAL ROLE

 The Committee asserts that it is immune from suit because of its "judicial or quasi-judicial" role. While the Committee has served in a quasi-judicial capacity, the Committee has also acted in commercial and non-judicial capacities. This court's jurisdiction in this matter is based upon the latter.

As discussed above, the Committee engaged in commercial activity that was neither judicial or quasi-judicial. That commercial activity having a direct effect in the United States subjects the Committee to this court's jurisdiction under the FSIA. Moreover, when the Committee appeared before this court and filed an extensive answer to plaintiffs' complaint, it was not acting in a judicial or quasi-judicial capacity. As discussed above, the Committee's

---

**23.** *But see Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 73 (2d Cir.1977) (Expropriation of property of alien within boundaries of sovereign state are traditional public acts of sovereign, removed from judicial scrutiny by application of Act of State Doctrine).

In this case, however, Galadari, whose property was seized, is not an alien in Dubai. And while the nationalization of oil property in *Hunt* was accompanied by political statements suggesting reprisal against the United States as the motive and indicating that the nationalization was a public act, *Hunt,* 550 F.2d at 73, the seizure of Galadari's property was not accompanied by any such political statements. Non-public or commercial acts do not fall within the ambit of the Act of State Doctrine.

**24.** *But see Braka v. Bancomer, S.N.C.,* 762 F.2d 222, 225 (2d Cir.1985) (where situs of debt is wholly within foreign sovereign, Act of State Doctrine may bar recovery).

**25.** The test for "situs" in the context of the Act of State Doctrine is whether the purported taking was "able to come to complete fruition within the dominion of the [Dubai] government." *Allied,* 757 F.2d at 521 (*quoting Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706, 715–16 (5th Cir.), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968)).

Here, because defendants' acts involved debts payable to banks in the United States, they could not come to complete fruition within Dubai.

general appearance and participation constituted an implicit waiver of immunity.

Defendant Committee cites authority for the proposition that members of the judiciary such as administrative law judges [26] and arbitrators [27] are immune from suit for actions they take in their judicial or quasi-judicial capacities. Defendant, however, cites no authority to support its claim that a foreign state or agent subject to the court's jurisdiction under the FSIA, that is, which has engaged in commercial activity or which has actively participated in litigation before the court, is immune from suit. Indeed, the FSIA explicitly states that where a party is subject to the court's jurisdiction under the FSIA, it is liable just as a private individual is liable.[28]

The Committee's judicial or quasi-judicial activities do not immunize it from suit, given the court's authority under the FSIA as to its commercial and non-judicial activities.

## VI. PLAINTIFFS' CLAIMS ARE TIMELY

Defendants argue that plaintiffs claims are barred by the statute of limitations, asserting that plaintiffs' claims arose, if at all, in 1984.[29] Defendants' statute of limitations claim is unpersuasive and somewhat disingenuous. It is undisputed that plaintiffs' original claims against Galadari were timely. At that time, the Committee entered this litigation on Galadari's behalf and as an agent of Dubai. The Committee persuaded this court to stay its proceeding on comity grounds pending proceedings in Dubai. This court sustained the stay at the Committee's request for four years until this court determined that the proceedings in Dubai were unsatisfactory and undeserving of comity and lifted the stay.

Defendants cannot now argue, after delaying this case for four years in Dubai, that plaintiffs' claims arising out of the same dispute is untimely. Plaintiffs' claims are not barred by any statute of limitations.

## VII. PLAINTIFFS' MOTION FOR SECURITY

Plaintiffs have moved jointly to require defendants to post a bond as security for costs, attorneys' fees, any judgment that may be entered and any award of sanctions that may be levied against the Committee in this action. Drexel's motion for security for costs is granted. Refco's motion for security for costs including attorneys' fees is granted. Plaintiffs' motion for security covering judgment and sanctions is denied.

Section 1606 of the FSIA states that a foreign state or instrumentality under the subject matter jurisdiction of the court is to be treated as any other private litigant. Under Local Rule 39 this court may require security for costs of a party to the litiga-

---

**26.** *E.g., Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), *on remand,* 466 F.Supp. 1351 (S.D.N.Y.1979) (quasi-judicial function of administrative law judge entitled him to immunity).

**27.** *E.g., Austern v. Chicago Bd. Options Exch. Inc.,* 898 F.2d 882, 886 (2d cir.), *cert. denied,* 498 U.S. 850, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990) ("the Courts of Appeals ... have uniformly immunized arbitrators from civil liability for all acts performed in their arbitral capacity").

**28.** FSIA § 1606 provides:

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances....

*See also Verlinden,* 461 U.S. at 488–89, 103 S.Ct. at 1968–69.

**29.** Defendants acknowledge that the FSIA sets no statute of limitations for suits against foreign states or their agents. Nevertheless, defendants contend that because foreign states are to be treated as any other private party, under § 1606, the statute of limitations that would apply to a private party should apply to Drexel and Refco in their suit against Dubai and the Committee. Defendants assert that it is an issue of first impression for the court to determine whether federal taking claims, state claims involving the expropriation of property, or conversion claims provide the best analogy. Defendants argue that plaintiffs time for suit has expired under any of the potentially applicable limitation periods.

tion. Local Rule 39 states in pertinent part:

> The court, on motion or in [sic] its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate.

The application of this Rule is not unprecedented.[30] Therefore plaintiffs' motion as to costs is granted.

While Rule 39 only specifies security for costs, security for attorneys' fees may be included in that award where the party seeking the security is otherwise entitled to attorneys' fees—e.g. by statute or contract.[31]

Refco, in this case, is entitled to security for attorneys' fees because its contract with Galadari specifically states that Refco is entitled to attorneys' fees in the event of litigation concerning any collection action. Plaintiffs' Memorandum of Law in Support of Plaintiffs' Joint Motion for Security at 13.

Security covering potential judgment or sanctions is beyond the language and scope of Rule 39. Therefore plaintiffs' motion for security as to those awards is denied.

Drexel should submit affidavits outlining and detailing accrued and prospective costs. Refco should submit affidavits outlining and detailing same, including attorneys' fees.

## VIII. CONCLUSION

For the foregoing reasons, the motions of the Emirate of Dubai and the Committee of Receivers to dismiss plaintiffs' amended and supplemental complaint is denied. Drexel's motion for security covering costs not including attorneys' fees is granted. Refco's motion for security covering costs, including attorneys' fees, is granted. Plaintiffs' motion for security covering potential judgment and sanctions is denied.

Submit Order on 15 days notice regarding costs.

---

**30.** *See Cresswell v. Prudential–Bache Securities, Inc.,* 1987 WL 4824 (S.D.N.Y. April 28, 1987) (awarding security for costs to defendant against Italian plaintiff prior to trial under Local Rule 39; "No question has been, or could be, raised with respect to the applicability of the Local Rule"); *Knight v. Yerkes and Associates, Inc.,* 675 F.Supp. 139, 142 (S.D.N.Y.1987) (where plaintiff was resident of Thailand and collection of costs might be difficult, court granted security under Rule 39 covering depositions that would occur in various countries); *Tri–Ex Enterprises, Inc. v. Morgan Guaranty Trust Company of New York,* 1985 WL 144 (S.D.N.Y. January 11, 1985) (granting defendants' motion for costs under Local Rule 39).

**31.** *See Herbstein v. Bruetman,* 141 F.R.D. 246, 247 (S.D.N.Y.1992) ("The security for costs may include attorney's fees to which a party is potentially entitled"); *Beverly Hills Design Studio (N.Y.) Inc. v. Morris,* 126 F.R.D. 33, 36 (S.D.N.Y. 1989) ("While the language of Rule 39 limits itself to costs, attorneys' fees have been included in a cost bond where the defendant was statutorily entitled to them"). *See also Verone v. Taconic Telephone Corp.,* 85 Civ. 8574, 1988 WL 10871, 1988 U.S. Dist. Lexis 1002 (S.D.N.Y.1988) (dismissing case where plaintiff failed to post security for cost, attorneys' fees and possible sanction as ordered following an arbitration award against him).